Van Vorst, J.
The rain on the 8th July was an efficient and proximate cause of the injury which the defendants’ iron sustained. When hoisted up the hatchway *237 in defendants’ warehouse from the trucks, the water was running out; and being examined shortly afterwards it was found to be still wet, and the injury such as fresh water would occasion ; under such circumstances, it is useless to inquire whether the injury might not have been produced during the voyage, by some of the excepted causes mentioned' in the bill of lading. No evidence was adduced as to the presence of such causes in the vessel. But on the other hand, the plaintiff’s proof shows that the storage of the iron in the vessel was proper, and that when it was “ hove up,” and landed on the dock, there were no signs of wet.
The bill of lading signed by the master, expressly limited the number of bundles received in a wet condition at five. Such entry made at the time, by the party to be chiefly affected, would be presumed to state most broadly the number received by him in a wet condition. The damages on five bundles are not embraced in the verdict and judgment in this action.
The jury have found that the injury complained of was occasioned after the iron was unloaded and placed on the pier.
The plaintiff’s counsel claims that the contract of affreightment was completed when the iron was placed on the pier; that the goods were then legally delivered to the consignees by the carrier, and that he is not responsible for injuries thereafter occurring.
In support of this proposition, it is urged, on the part of plaintiff, that it was the duty of the owner to have taken the goods “from alongside” immediately the vessel was ready to discharge, otherwise the privilege was reserved to the vessel to land them on the “ pier.” What particular “pier” is not stated. There is no evidence that the defendants were notified by, or in behalf of, the carrier, at what time or at what place the vessel would be ready to discharge, or that opportunity or choice was afforded them to take the goods “from *238 alongside.” The vessel went immediately to her own dock, and without notice to the consignees commenced to discharge her whole cargo. In this work several hours were consumed before the defendants’ iron, which lay near the bottom of the barge was reached, goods above requiring to be first removed. A “night permit” having been obtained, a portion of the cargo was taken out on Thursday night. Haste was required in her unloading, as the vessel was to commence her return voyage on the following Saturday, and in the meantime she was to be both disburdened and reloaded.
If the plaintiff intended to insist strictly on the terms of the bill of lading, that the goods should be removed “ from alongside,” notification of the vessel’s readiness to discharge, and where, should have been given to the defendants, and reasonable opportunity afforded them to make the necessary preparation on their part to do so. Spch requisition is surely not unreasonable. It may be inferred that in going to the pier, which proved to be her own, and landing the goods there, it was for the more convenient discharge of the whole cargo, and, as far as defendants were concerned, was a waiver of the removal “from alongside.”
The simple deposit of the goods on the pier did not, in law, discharge the carrier from further responsibility for their safety, and that whether they were landed on Thursday night or Friday morning. The time of landing, that is whether it be in the night or in the day time, does not control.
It has been repeatedly adjudicated that the landing by a carrier of merchandise on a public or private wharf or pier, does not terminate his liability as such. This act must be supplemented by due and reasonable notice given to the consignee, and a fair opportunity afforded him to remove the goods before the responsibility of the carrier can be ended. Nor should the goods landed be mixed with the merchandise of others, so that they *239 cannot be distinguished. They should be separated and set apart (The Ship Ben Adams, 2 Benedict, 449; The Eddy, 5 Wallace, 481, 495; 3 Kent’s Com.).
Nor in the event that the goods be not seasonably removed, or though the consignee refuse them even, may the carrier abandon or negligently expose them to damage. If the goods remained in his possession, his liability as warehouseman would commence when his responsibility as carrier ended.
In the case of Price v. Penell (3 Carn’s. 322), six boxes of marble tomb tops had been shipped on a vessel at New York, to be delivered to the owner in good order at the Port of Wilmington, N. C, to which place the vessel Avas bound. Notice was given at Wilmington, by the consignee of the vessel, to the owner of the marble late in the evening of the day of the marble’s having been taken out, and that it was lying on the wharf. The owner of the marble had heard during the day of the arrival of the vessel; late in the evening he visited her at the wharf, and was informed that the marble was unloaded.
The next morning he went to the wharf, and, on examination, found some of the tops broken. The master claimed, and'the evidence tended to show, that the damage had not occurred during the voyage, as they had been properly stowed against the stanchions on their edges. On the trial, the defendants, the owners of the vessel, asked the judge to charge the jury that the plaintiff could not recover without shoAving that the marble was broken whilst in the possession of defendants, and before the termination of the voyage, and that the carrier’s duty was ended by the delivery of the marble on the wharf, at which time it was not shown that the same was injured. The court refused so to charge. But did charge that a delivery at the wharf was not sufficient to exonerate defendants from their liability as carriers, without notice to the consignee, and also that the con *240 signee has a reasonable time after notice within which to take possession of the property, and if the marble was broken on the wharf overnight, the consignee not having had a reasonable time to remove it before the next morning, the carriers would still be liable.
The ruling of the judge on the trial was sustained by the Court of Appeals.
The case of Redmond v. Liverpool, N. Y. &. Phil. S. S. Co., 46 N. Y. 578, contains an elaborate review of the law respecting the duty and liability of carriers in regard to the delivery of goods on a wharf or pier, when no particular place of delivery has been designated by the shipper or consignee.
In that case the carrier had delivered 23 boxes of merchandise consigned to a party at New York on pier No. 44, which was under its control. After being landed, they were checked off by a person acting for the ship. The consignee carted away and gave receipts for all the boxes except one, which after being landed safely, had in some way disappeared. The carrier was held liable to the owner for the value of the lost package. It was held in that case, that a carrier by water is not relieved from all responsibility by a discharge from his vessel at a wharf or place of discharge not selected by the owner for storing his goods. That, until a reasonable time has elapsed for the owner to remove the goods, they are at the risk of the carrier. See also Ostrander v. Brown, 15 Johns. R. 39; McAndrew and others v. Whitlock, 2 Sweeney, 623.
Under the bill of lading in the case before us, the privilege was reserved to the vessel to land the iron on the pier, or put them into craft, or deposit them in the warehouse designated by the collector of the port of New York, in the event of the goods not having been removed ‘ ‘ from alongside ” by the owner. As already observed, no particular pier was designated in the bill. Plaintiff elected to place them on a pier under his own *241 control, attached to which was a gate from which the goods were delivered to consignees.
The defendants had heard of the arrival of the vessel. From whom they had heard this does not appear. At mid-day, on Friday, they sent tarpanlings to cover, and carts to remove, their property. The iron had not yet passed the custom-house scales, and could not be removed until weighed, even had it been-prudent to have attempted it in view of the impending storm. It had been the duty of the plaintiff, up to this time, and at least until a reasonable time after defendants’ actual knowledge, on Friday noon, of the goods being on the pier, to have cared for them with the diligence required of a common carrier. Plaintiff’s company had a large shed at the bulkhead on the pier, where two-thirds of the cargo had been stored, which was entirely secure ; defendants’ merchandise was not placed there, but it was piled farther down the dock, under a shed which was covered on the top, but was not enclosed all the way down, and in the sides of which there were also large openings. The iron was arranged with its ends sticking out towards the open sides, and was exposed to the weather. The agents of the plaintiff in charge of the merchandise knew of its exposed condition. It was Bussia sheet-iron, whose surface was readily injured by water. After placing it in this position, and when they saw the storm coming, they had placed over this, and other portions of the cargo, the ship’s tarpaulings. They claim in this manner to have covered all the cargo except that which was in the shed in the bulkhead, and to have done" it well. The action of the plaintiff in this regard does not indicate that he considered himself relieved of all liability by simply placing the iron on the pier. But whatever he undertook to do should have been so well done, as to have actually shielded the property from the coming rain.
The servants of the defendants on their arrival (Friday *242 noon), on examination, concluded that their goods were not sufficiently covered, “and that they were exposed to damage from water. Defendants’ goods had not been distinctly separated, but were lying intermixed with similar merchandise belonging to others. They were about to cover a portion of their iron much exposed, and upon which the rain fell, with their remaining tarpauling, having used the others on different portions of the merchandise, when it was forcibly taken from them by the ship’s stevedore, and others engaged in the plaintiff’s service in unloading the ship, and was used by them to cover the hatchway of the vessel, and to protect the property of others in its hold. Whether this act was a trespass or not, it is of no consequence to inquire. It shows that the defendants had not yet been entrusted by the carrier with the exclusive control and care of their own goods. It is only reconcilable with the idea that the carrier considered the goods still in his care, and that in his judgment they were already sufficiently protected by the ship’s tarpaulings, and he was willing to assume, in his anxiety to protect other property in his charge, that the precautions he had taken to guard defendants’ property was sufficient.
The plaintiff’s witness, Brush, testified: “I saw the storm coming up some time before it came. I got my tarpaulings out, got the men to work, and covered it up,” and he insisted that he had covered it so well that it was shielded from the rain.
In so understanding, and in his efforts to meet his responsibility, with respect to the goods of the defendants and others in his charge, the plaintiff acted under the legal obligation resting upon him. But if the goods were damaged by the rain, notwithstanding what he did, he is responsible, not as a trespasser in taking the defendants’ tarpauling, but as a common carrier.
There is nothing in the excepted clauses in the bill of lading which excuses the carrier from damages sus *243 tained on the pier, although it may have resulted from the improper conduct of his own employés.
The evidence fully justified the jury in finding that the injury resulted from the exposure to rain while the goods were on the pier (in the plaintiff’s case). The judge instructed the jury, “ It is for you to say when the iron was injured; and if you find it was injured here, while under the care of steamship’s company, you will then ascertain the amount of the injury it then sustained.” What was said by the judge in respect of the damage being the result of the taking away of the tarpauling by the stevedore or other agents of the ship, could hot affect the substantial result. In one aspect it was true that if the tarpauling was necessary to protect the iron from the rain, and its abstraction left it exposed, then the damage might be said to follow the act. The damages proved on the sale of the goods at auction was $979, and that is the precise amount the jury allow.
We see no substantial error in the ruling and decisions on the trial, or in the result. The motion for a new trial is denied, and judgment should be affirmed, with costs.